CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

EMILY R. DAHLKE (CABN 322196)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    Emily.Dahlke@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     Plaintiff, <br>   v. <br> CARLOS JOEL CASTRO-ARTEAGA, <br>     Defendant. | Case No. 4:25-cr-00324-HSG <br><br> **UNITED STATES' SENTENCING MEMORANDUM** <br><br> Sentencing Date: January 21, 2026 <br> Hearing Time: 2:00 p.m. <br><br> Hon. Haywood S. Gilliam Jr. |

## I. INTRODUCTION

Over the course of multiple undercover drug transactions, Carlos Joel Castro-Arteaga ("defendant") sold large quantities of fentanyl to an undercover officer. A subsequent search of his shared residence and a vehicle he regularly drove, resulted in the seizure of over four pounds of fentanyl, $42,000 cash, a hydraulic pill press, pill castings and drug manufacturing tools, a firearm, and ammunition. The United States respectfully recommends he be sentenced to a term of imprisonment of 87-months, followed by four-years of supervised release.

## II. PROCEDURAL HISTORY

On July 8, 2025, a criminal complaint was filed charging defendant with one count of violating 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi) –Possession with Intent to Distribute 40 Grams or More of a

Mixture and Substance Containing Fentanyl. PSR ¶ 1. On October 9, 2025, a one-count information was filed, charging Defendant with the same count as alleged in the complaint. PSR ¶ 2. On October 29, 2025, Defendant pled guilty to Count One in the information. PSR ¶ 3. Sentencing is set for January 21, 2025.

## III.     FACTUAL OVERVIEW

Defendant was the user of a phone number ending in 8921 ("number"). In February of 2025, an undercover agent ("UC") with the Drug Enforcement Administration ("DEA") contacted the number and requested to purchase fentanyl. PSR ¶ 8. Defendant agreed to sell the UC fentanyl. *Id*. On February 6, 2025, Defendant met with the UC in Oakland and sold the UC fentanyl. *Id*. Defendant, believing he had a new customer, continued to regularly sell the UC fentanyl, selling the UC fentanyl on March 18, 2025, May 15, 2025, and again agreeing to sell the UC fentanyl on July 21, 2025 – at which time he was arrested by law enforcement. PSR ¶¶ 8-17. A search of his residence revealed over four pounds of fentanyl, drug manufacturing equipment (including hydraulic pill presses, pill castings, and mannitol containers) and over $40,000 cash. PSR ¶¶ 16-17.

### A.     Defendant Sells the UC 28.3 Grams of Fentanyl in Oakland on February 6, 2025

On January 31, 2025, the UC texted Defendant's number, asking if Defendant was "working". After Defendant responded that he was working, the UC and Defendant discussed pricing for "blue" (a common street name for fentanyl) and Defendant agreed to sell the UC 25 grams of "good blue". An translated excerpt of the text messages are provided below. [1]

```
UC: Ay you working?
JOEL: Yes
UC: Do you have the blue?
JOEL: Yes, how much do you occupy?
UC: Do you have one ounce? and how much?
JOEL: 700 is worth an ounce
UC: I have 600
JOEL: I'll give you about 25 grams
UC: Ok is it good? good blue?
JOEL: Yes
```

On February 6, 2025, Defendant told the UC to meet him in Oakland at the intersection of Jayne Avenue and Perkins Street, near a Chevron gas station. PSR ¶ 8. When the UC told Defendant where the

---

[1] Produced to Defendant and United States Probation at USA-000936.

UNITED STATES' SENTENCING MEMORANDUM   2
4:25-cr-00324-HSG

UC was located, the Defendant told the UC he did not want to meet at the gas station to sell the UC fentanyl because of surveillance cameras. *Id.*

The UC eventually drove to a location nearby that was agreeable to Defendant. PSR ¶ 8. The UC approached Defendant's vehicle (a Nissan Altima), where Defendant was sitting in the driver's seat. Defendant gave the UC 28.3 grams of fentanyl in exchange for $600. *Id*.

On multiple occasions in February and March, Defendant and the UC texted about Defendant providing UC with a "sample" of heroin. Ultimately, Defendant never provided the UC with a sample, telling the UC that "it's dangerous to go out just because of that [to provide the UC with a sample]".[2] Just as Defendant did not want to sell fentanyl in an area where there were cameras, he also carefully analyzed when the risk of being caught was worth the profit he would make from distributing drugs.

B.  Defendant Sells the UC 55.9 Grams of Fentanyl in Oakland on March 18, 2025

On March 18, 2025, Defendant once again sold the UC fentanyl. PSR ¶ 10. Prior to the distribution, the UC and Defendant exchanged text messages regarding the sale. *Id*. Defendant told the UC to alert Defendant 30 minutes prior to the UC's arrival to the pre-agreed location near the intersection of Jayne Avenue and Perkins Street in Oakland. When the UC alerted Defendant as he was instructed, Defendant responded "I'm going to make them for you right now". An excerpt of the translated text messages is depicted below.[3]

> UC: Wassup bro im on my way. I will be therr in 30 minutes
>
> CASTRO-ARTEAGA: Ok, it's fine, friend, I'm going to make them for you right now
>
> CASTRO-ARTEAGA: 2 you will need
>
> UC: Si dos onzas (Yes two ounces)
>
> CASTRO-ARTEAGA: Ok, I'm going to do them right now

Shortly after those messages, DEA saw Defendant exit his residence at 325 Euclid Avenue in Oakland, get in the Nissan Altima, and drive to the area where the UC was located. PSR ¶ 10. Defendant

---

[2] Produced to Defendant and United States Probation at USA-000928.

[3] Produced to Defendant and United States Probation at USA-000944.

UNITED STATES' SENTENCING MEMORANDUM   3
4:25-cr-00324-HSG

approached the UC's vehicle and gave the UC two bags of fentanyl (total net weight of 55.9 grams) in exchange for $1,200. PSR ¶ 12.

### C. Defendant Sells the UC 84.2 Grams of Fentanyl in Oakland on May 15, 2025

On May 14, 2025, the Defendant again agreed to sell the UC to fentanyl. PSR ¶ 13. Prior to the meeting, Defendant the UC exchanged text messages regarding the fentanyl transaction, a translated transcript of which is below. [4]

> UC: Wassup bro will you have 3 oz of the fetty tomorrow?
>
> CASTRO-ARTEAGA: Ok, let me know about 2 hours before to have them ready?
>
> UC: Ok bro. How much per oz? Give me good price i may get mas (more)
>
> CASTRO-ARTEAGA: But what do you want iso or clean blue?
>
> UC: The clean
>
> CASTRO-ARTEAGA: 550 at least
>
> UC: Can u do 500 bro
>
> CASTRO-ARTEAGA: And how many will you need?
>
> UC: 3 oz
>
> CASTRO-ARTEAGA: Ok, it's fine, what time are you coming?
>
> UC: I should be in Oakland around 4:30pm
>
> CASTRO-ARTEAGA: Ok, let me know two hours before
>
> UC: Ok bro

"Clean" and "ISO" are street-terms that refer to a higher level of fentanyl concentration, or purity of fentanyl than fentanyl that is more heavily diluted with cutting agents. The UC agreed to meet the Defendant at the West Oakland Bart parking lot. PSR ¶ 13. DEA observed Defendant exit his apartment prior to the drug sale, after which he drove to the Bart station in the Nissan Altima. *Id*. Defendant entered the UC's vehicle and sold him 168.4 grams of fentanyl in exchange for $1,500. PSR ¶ 14.

The UC asked Defendant if Defendant had additional fentanyl to sell the UC. Defendant told the

---

[4] Produced to Defendant and United States Probation at USA-000929.

UC he did, but would have to go home and check how much fentanyl he had. Approximately one hour later, he texted the UC "…I arrived here at my house and my friend says he sold them and the ones he had." [5]

    D. <u>Defendant's Residence Contained 4 Pounds of Fentanyl, Drug Manufacturing Equipment and $42,000 Cash</u>

In addition to repeatedly being observed by DEA coming and going from an apartment located at 325 Euclid Avenue, GPS location data from Defendant's cell-phone placed Defendant at the apartment nearly every night for several months. Data from a GPS vehicle tracker on the Nissan Altima Defendant was regularly seen driving also placed the vehicle at the apartment every day for several months.

On July 21, 2025, DEA arrested Defendant pursuant to a federal warrant and executed a search warrant for his residence at 325 Euclid Avenue, Oakland, a small, one bedroom apartment. Inside a room that belonged to Defendant, law enforcement seized fentanyl, a cell-phone, 12 unfired rounds of 9mm ammunition and the car keys to the Nissan Altima Defendant was seen driving. PSR ¶ 15. Law enforcement searched the vehicle and recovered a 9mm firearm along with additional rounds of ammunition and fentanyl. PSR ¶ 17. In the shared living space, law enforcement recovered over four pounds of fentanyl, $42,659 in cash, and a pill press, pill castings, drug scales, and other drug manufacturing equipment. PSR ¶ 16. Images of some of the recovered items are depicted below and




---

[5] Produced to Defendant and United States Probation at USA-000933-934.

UNITED STATES' SENTENCING MEMORANDUM   5
4:25-cr-00324-HSG

above.[6]



## IV.    SENTENCING GUIDELINES CALCULATION

The government respectfully disagrees with PSR's calculation of the Defendant's sentencing guidelines, but notes that both the government and the PSR's calculation result in the same total offense level of 29.  Based on information available to the parties at the time they entered into the plea agreement, and pursuant to that plea agreement, the government calculates the Defendant's guidelines as follows: a base offense level of 30, pursuant to U.S.S.G. § 2D1.1(c)(5); an additional 2 points for maintaining a premise for the purpose of manufacturing or distributing a controlled substance, pursuant to U.S.S.G. § 2D1.1(b)(12); and a reduction of 3 points for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, for a total adjusted offense level of 29. Dkt. 33. Therefore, the government respectfully objects to the PSR's base offense level calculation of 32, and also objects to the two point reduction pursuant to USSG §§4C1.1(a) and (b). As noted, both the PSR and the government's calculation of Defendant's sentencing guidelines result in a total offense level of 29. With a CHC of I and a total offense level of 29, his guidelines range is 87-108 months.

---

[6] Produced to Defendant and United States Probation at USA-008841; USA-008905; USA-008932.

//

## V. APPLICABLE LAW

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991–93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the Defendant, the Court should consider these factors applicable to this case, among others:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need for the sentence to protect the public from future crimes of the defendant;

(5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(6) the need to provide restitution to any victims of the offense.

## VI. RECOMMENDED SENTENCE AND SECTION 2552(a) FACTORS

Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends a custodial sentence of 87-months imprisonment, followed by 4-years of supervised release. The government submits that an 87-month term of imprisonment, which is the low-end of the guidelines range, is the just and appropriate sentence under the circumstances.

Over a period of several months, Defendant repeatedly distributed significant quantities of fentanyl, a deadly drug, to a UC. Based on his text messages with the UC, he was selling fentanyl before he met the UC, and he exercised great care and concern to avoid detection. Additionally, a search of the

Defendant's residence revealed him to be a professional drug dealer. DEA uncovered pounds of fentanyl, $42,000 cash, as well as a pill press, pill castings, cutting agents and various manufacturing equipment. All of these factors, when considered together, demonstrate Defendant is a professional drug dealer, who was good at his "job". Unfortunately, the work of the Defendant and other drug traffickers like him, leads to the destruction of lives and communities.[7]

### a. The Nature and Circumstances of the Offense Warrant an 87-Month Sentence

As described above, Defendant's behavior creates an enormous public safety risk. He repeatedly sold significant quantities of fentanyl to a UC. And the charged conduct, while incredibly serious on its own, understates his criminal culpability. It's disturbing to imagine just how many drug transactions he completed in order to possess $42,000 in cash the day he was arrested, not to mention the considerable street value of over four pounds of fentanyl in his home. Additionally, he is illegally in the United States and has already been previously deported. PSR pg. 3; PSR ¶ 47. According to the bail-study conducted in this case, he also uses a number of aliases or variations of his own name, a common tactic by criminals to obfuscate their identity from law enforcement. Dkt. 9. A low-end guidelines sentence of 87-months is necessary, in this case, for this defendant.

### b. An 87-Month Sentence Reflects the Seriousness of the Offense, Provides Just Punishment and Adequate Deterrence

An 87-month sentence reflects the seriousness of the offense, promotes respect for the law, and provides both general and specific deterrence. Not only would an 87-month sentence provide specific deterrence to Defendant, but it will also provide general deterrence to others who already are, or are considering, selling fentanyl in the streets of Oakland. (*United States v. Hutson*, 183 F. App'x 675, 676 (9th Cir. 2006) "(general deterrence is a permissible sentencing consideration"). The defendant, like other drug dealers in Oakland, must be confronted with the reality of a significant consequence for selling fentanyl. Without a clear and substantial deterrent, those who traffic in dangerous substances like fentanyl will continue to perpetuate the devastating overdose crisis in the community. An 87-month sentence is sufficient, but not greater than necessary, to achieve the sentencing factors outlined in 18

---

[7] https://www.sfchronicle.com/eastbay/article/drug-overdose-oakland-san-francisco-21102561.php

U.S.C. § 3553(a).

## VII. CONCLUSION

For the foregoing reasons, the United States respectfully recommends the Court impose a sentence of 87-months imprisonment, followed by four-years of supervised release.

DATED: January 14, 2026                                      Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Emily R. Dahlke*
EMILY R. DAHLKE
Assistant United States Attorney